**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **JOSHUA MAULDIN** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **TARIK SMAJIC** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No. |
| | ) | |
| **TODD BLANCHE,** | ) | **JURY TRIAL DEMANDED** |
| in his official capacity as | ) | |
| Acting U.S. Attorney General | ) | |
| U.S. Department of Justice | ) | |
| 950 Pennsylvania Avenue NW | ) | |
| Washington, DC 20530 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>COMPLAINT</u>

Plaintiffs Joshua Mauldin and Tarik Smajic allege as follows:

### <u>INTRODUCTION</u>

1. This is a civil action against Todd Blanche in his official capacity as the acting

U.S. Attorney General for damages for injuries Plaintiffs Joshua Mauldin and Tarik Smajic

sustained as a result of the Department of Justice's ("DOJ" or "agency") failure to

accommodate their disabilities, disparate treatment on the basis of their disabilities, and for

retaliation because they requested reasonable accommodations and pursued EEO claims for

failure to accommodate, in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq*.

2. Mauldin and Smajic both work as Supervisory IT Program Managers in the DOJ

Criminal Division's (CRM) Office of Administration (ADM). Following the Trump

administration's January 2025 return-to-office mandate, ADM Executive Officer Stacie Bass—Mauldin's and Smajic's third-line supervisor—refused to grant their February 2025 requests for telework as a reasonable accommodation for their significant and permanent physical and psychological disabilities, despite their proven record of successful performance while teleworking under previous telework agreements.

3.     Mauldin served honorably for twenty years in the United States Marine Corps and United States Air Force, including active duty and reserve service, multiple combat deployments, and operational support tied to the Albania/Kosovo campaign, Operation Enduring Freedom, and Operation Iraqi Freedom. He supported high-stakes special operations missions and military units operating in combat zones and later supported sensitive USCYBERCOM missions. He retired from the military in May 2021 as a 100% permanent and total disabled veteran diagnosed with service-related Post-Traumatic Stress Disorder (PTSD), Generalized Anxiety Disorder (GAD), and several cardiac conditions.

4.     In April 2017, only a few months after Smajic's sister passed away, a drunk driver traveling at a high rate of speed rammed into Smajic's vehicle as he drove to the hardware store to pick up paint he planned to use in the restoration of his childhood home. Smajic suffered serious spinal injuries including multiple herniated discs, nerve damage, soft tissue damage, and burns. Since the crash, he has lived with chronic pain and progressive spinal limitations that his doctors believe are permanent.

5.     Mauldin and Smajic did not request telework as a reasonable accommodation out of a desire for personal convenience or to shirk their work obligations. To the contrary, telework is without question the most effective accommodation that would enable them to continue to dedicate their lives to service of their country and provide for their families, while

2

managing the pain and other symptoms of the devastating injuries that forever changed their lives.

6.      After Mauldin and Smajic requested telework as a reasonable accommodation, the agency retaliated against them in an effort to force them out of the agency. The agency demoted Mauldin, removed his Assistant Director title, and stripped him of supervisory duties despite his documented record of exceptional service to the agency and his significant personal sacrifice to the nation through his military service. The agency forced Smajic to report to the office in person while refusing to provide any of the same in-office equipment he purchased and uses while working out of his home office to accommodate effectively his chronic pain and other physical symptoms.

7.      On information and belief, starting in January 2025 and continuing through the present, the agency has systematically and intentionally discriminated against employees with disabilities by categorically refusing to make final decisions granting requests for telework as a reasonable accommodation, in flagrant violation of the Rehabilitation Act.

## PARTIES

8.      Plaintiff Joshua Mauldin is a resident and citizen of Frederick County, Virginia.

9.      Plaintiff  Tarik Smajic is a resident and citizen of Duval County, Florida.

10.     Defendant Todd Blanche in his official capacity is the acting Attorney General and heads the U.S. Department of Justice.

## JURISDICTION

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 (federal question) as this action involves federal questions regarding the Defendant's deprivation of Plaintiffs' rights under the Rehabilitation Act, all of which occurred in this

judicial district.

12.    This Court may grant declaratory relief pursuant to 28 U.S.C. § 2201(a).

### VENUE

13.    Venue lies in this district pursuant to 42 U.S.C. § 2000e-5(f)(3) because the discriminatory and retaliatory employment practices alleged herein were committed in this District.

### FACTUAL BACKGROUND

14.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

### Joshua Mauldin

15.    Mauldin suffers from Post-Traumatic Stress Disorder (PTSD) and Generalized Anxiety Disorder (GAD) as a result of his military service. These conditions manifest in heightened physiological responses to environmental triggers such as crowds, traffic, unexpected in-person encounters, and other high-stimulation settings. When triggered, they can cause acute anxiety, disorientation, rapid escalation of heart rate, rapid-onset sweating, trembling, an urgent need to locate an escape route, and a sudden feeling of panic or dread. His breathing can become shallow and quick, his muscles tighten involuntarily, and his awareness narrows as he locks into survival mode. He is also prone to heightened startle responses and episodes of derealization, where his surroundings feel distorted or unreal. These symptoms can occur within seconds of exposure and impair his ability to concentrate, process information, and communicate effectively in the moment.

16.    Mauldin's cardiac diagnoses include Wolff-Parkinson-White (WPW) syndrome, atrial fibrillation (AFib), and tachycardia, and these cardiac episodes can lead to dangerous

arrhythmias, reduced cardiac output, and related medical complications.

17. Because Mauldin's psychiatric and cardiac disabilities interact, tasks that might be routine for others, such as attending in-person meetings, working in high-traffic office areas, and commuting, carry a significant and documented medical risk for him. The limitations are permanent, and the severity can range from moderate interference with concentration to acute, disabling episodes that halt his ability to function until symptoms stabilize.

18. Mauldin began working for DOJ's Civil Division in December 2022 as an Information Technology Project Manager. While with the Civil Division, the agency granted Mauldin's reasonable accommodation request for 100% telework with in-office presence only on an as-needed basis and with twenty-four hours' advance notice, which allowed Mauldin to effectively perform the essential functions of his position for years.

19. Mauldin transferred to the CRM in February 2024 into a new position as Supervisory IT Program Manager.

20. As a Supervisory IT Program Manager, Mauldin serves as an Assistant Director over an Information Technology Management (ITM) unit. His essential functions include: directly managing multiple projects for the organization; serving as the Contracting Officer's Representative (COR) on all related contracts; creating structured schedules and project plans and tracking deadlines and receivables for those projects; formulating and reviewing ITM policies and processes; and directly supervising federal and/or contract members of his unit.

21. Upon Mauldin's transfer to CRM in February 2024, Executive Officer Stacie Bass told him that she required him as a CRM supervisor to report to the office in-person at least one day per week.

22. Bass's one-day-per-week in-person expectation was not an official agency

policy, and the essential functions of Mauldin's position did not require his in-person presence. At all times relevant to this complaint, all of Mauldin's supervisory and other job duties can be performed successfully while teleworking full time.

23.    Mauldin later learned that Bass allowed a non-disabled CRM Supervisory Budget Analyst and a non-disabled CRM Supervisory Financial Manager under her supervision to telework full-time starting well before February 2024 and continuing through March 2025—the same time period during which Bass required Mauldin to report to the office in person one day per week.

24.    From February 2024 through the first part of January 2025, Mauldin was able to report to the office one day per week without exacerbating his disabilities because the office was largely empty at the time given the prevalence of remote work agreements, so there were far fewer potential triggers for his service-connected PTSD, Generalized Anxiety Disorder, and stress-sensitive cardiac conditions.

25.    The job duties that Mauldin performed on the days he reported to the office in person did not need to be performed in person, and he performed them equally effectively while teleworking from his home office. Indeed, Mauldin can perform all essential functions of his Supervisory IT Program Manager position while teleworking.

26.    For the February 26, 2024 to July 14, 2024 and the July 15, 2024 to June 30, 2025 appraisal periods, Mauldin received an "Exceeds Expectations" rating while teleworking four days per week as a reasonable accommodation for his disabilities.

27.    Mauldin's exceptional job performance during these appraisal periods demonstrates both that he could perform the essential functions of his position with accommodations, and that telework was a reasonable and effective accommodation for those

6

disabilities.

28.    In late-January 2025, the Trump administration issued a return-to-office mandate that purported to require federal agencies to require their employees to report to the office in person five days per week. The agency ordered all employees to begin reporting to the office five days per week, effective February 24, 2025.

29.    The return-to-office mandate materially changed the agency workplace environment. The office became noisier and more crowded, and Mauldin was subjected to unpredictable in-person interactions far more frequently on the days he reported to the office in person.

30.    On February 6, 2025, Mauldin submitted an updated request for RAs that would allow him to telework at least nine days out of every ten workdays per pay period, and to be required to report in person one day per pay period only if his condition allowed, and only if his in-person presence was necessary. Mauldin also requested that he be notified in writing at least twenty-four hours in advance of any requirement to report to the office in person more frequently than one day per pay period.

31.    Under CRM policy, a final decision on Mauldin's request for RAs should have been made within 30 business days, or by March 21, 2025.

32.    At the time Mauldin made this February 6, 2025 request for RAs, his supervisors knew about his disabilities. Specifically, Stacie Bass (third-line supervisor), Janusz Wasiolek (acting second-line supervisor), and Ken Moore (first-line supervisor) all had knowledge of Mauldin's disabilities and his requests for RAs, as did Reasonable Accommodation Coordinators Rebecca Merritt and Zainub Cementwala.

33.    During an April 1, 2025 meeting that Bass needlessly required Mauldin to attend

in person, the purported purpose of which was to discuss Mauldin's February 6, 2025 request for RAs, Bass minimized and mocked the severity of Mauldin's disabilities and the effectiveness of the telework RA he had successfully followed for the previous year.

34. During the April 1, 2025 meeting, Bass refused to grant Mauldin's February 6, 2025 request for RAs, and instead "offered" to move Mauldin from his existing four-day-per-week telework schedule to a schedule in which Mauldin would be required to report to the office in person five days per week, but for only half of each day. Presumably Mauldin would then be expected to return home each day and telework from his home office for the second half of the day.

35. Bass couched this threat of a five-day-in-office schedule as an interim alternative RA, but the schedule would do nothing to accommodate Mauldin's disabilities, and appeared specifically targeted to exacerbate his disabilities and worsen his health by increasing significantly Mauldin's exposure to known in-office stressors, plus the stress of daily commuting.

36. During the April 1, 2025 meeting, Bass told Mauldin that his position would be subject to a so-called "telework eligibility" review, which Mauldin also understood as a threat to revoke his ability to telework as a reasonable accommodation altogether. Mauldin had successfully performed the essential functions of his position while teleworking four days per week since February 2024, so there was no question that his job could be performed well while teleworking.

37. Bass's dismissive, confrontational, and hostile tone during the April 1, 2025 meeting left Mauldin fearful that not only would Bass deny his February 6, 2025 request for revised RAs, but that she would also revoke his existing four-day-per-week telework

8

accommodation, thereby making him unable to perform his job.

38.    Mauldin's uncertainty about his job security was compounded by the agency's refusal to make a final decision on his request for his RAs and Bass's implied threat that the "telework eligibility" review could result in the revocation of his existing telework accommodations.

39.    Over the ensuing months, Bass and Merritt would cite the purported ongoing "telework eligibility" review as the reason for the agency's delay in issuing a final determination on Mauldin's February 6, 2025 request for RAs, but on information and belief, that explanation for the delay was knowingly false and pretextual.

40.    At the same time, on information and belief, the agency did not subject non-disabled CRM managers who teleworked to the same type of purported "telework eligibility" reviews.

41.    On information and belief, the real reason that Bass refuses to make a final decision granting Mauldin's requests for telework as an RA has nothing to do with a "telework eligibility" review, but rather is because Bass and other agency RA decisionmakers have been systematically directed by agency leadership to make no final decisions granting telework as a reasonable accommodation for employees with disabilities.

42.    In April 2025, the Trump administration issued a return-to-office mandate for federal contractors, which made the agency workplace environment even more crowded and triggering to Mauldin's disabilities than it was before. Mauldin asked for a long-overdue final determination on his February 6, 2025 request for RAs, but Bass refused to grant one.

43.    On April 25, 2025—the day after Mauldin contacted the EEO counselor to raise his complaints for disability discrimination and retaliation—Bass granted Mauldin an interim

9

arrangement that required him to report in-person one day per pay period, rather than one day per week. On June 16, 2025, Bass extended that arrangement, but only on an interim basis, through September 26, 2025, despite the fact that Mauldin had submitted documentation from his medical providers that demonstrated his disabilities were permanent.

44.     On July 3, 2025, Mauldin submitted a revised request for RAs supported by new documentation from his cardiac surgeon noting that he was scheduled for a heart ablation procedure on July 23, 2025, due to a chronic cardiac condition that had worsened in recent months during a period of sustained job-related stress, which contributed significantly to the escalation of symptoms and the need for surgical intervention.

45.     Mauldin requested approval to telework full time every day of the week, with in-office presence only when required by mission needs and with at least 24 to 48 hours written notice from his supervisor ("100% telework"). This marked a shift from his earlier RA request, which required him to report to the office in-person one day per two-week pay period.

46.     Bass approved Mauldin's July 3, 2025 request for 100% telework, but only through September 26, 2025 and again only on an interim basis.

47.     On September 24, 2025, Bass refused Mauldin's September 11, 2025 written request to make a final decision on his  July 3, 2025 request for 100% telework. Rather than make a final decision, Bass prolonged the uncertainty of Mauldin's RAs by granting yet another "interim" approval for 100% telework through January 9, 2026, while the threat of the "telework eligibility" review continued to loom over him.

48.     On November 24, 2025, Mauldin received a memorandum from Human Resources Director Jennifer Chapman which purported to memorialize the results of a desk audit Mauldin requested back in May 2025 ("Desk Audit Memo"). Mauldin had requested a formal

10

desk audit of his position and requested that his GS-14 role be properly re-classified to the GS-15 grade level.

49.     The Desk Audit Memo revealed to Mauldin for the first time that Moore, Wasiolek, and/or Bass (described only as "Management" in the Desk Audit Memo) removed Mauldin's supervisory duties effective November 30, 2025 and intentionally provided inaccurate and misleading information about Mauldin's job duties, so that the desk audit would result in a reduction in grade, rather than an increase in grade.

50.     The Desk Audit Memo also revealed to Mauldin that he would be demoted and his grade reduced from GS-14 to GS-13 effective November 30, 2025, which will result in a salary reduction.

51.     On November 30, 2025, Chapman and Wasiolek, likely at the direction of Bass, issued Mauldin a new position description reflecting that he had been demoted from grade 14 to 13, and reflecting the fact that Bass and/or Wasiolek had removed several of Mauldin's significant job duties including program management, portfolio oversight, vendor and contract management, and supervision of federal and contractor staff.

52.     On January 15, 2026, Bass issued a new organizational chart of ADM Leadership. Following his demotion and removal of his supervisory duties, Mauldin had been removed from the ADM Leadership chart.

53.     Mauldin's demotion triggered a worsening of his PTSD and anxiety symptoms, along with increased episodes of cardiac arrhythmia.

54.     The desk audit process itself failed to follow established OPM guidance. Neither Mauldin nor the employees he supervised were interviewed, and the desk audit instead relied exclusively on input from the same responsible management officials Mauldin named in his EEO

11

discrimination and retaliation complaint.

55. The prolonged uncertainty caused by the agency's refusal to grant Mauldin's requests for reasonable accommodations, combined with the stress and instability caused by his demotion despite his strong performance evaluations, caused a significant deterioration of Mauldin's PTSD, anxiety, and stress-sensitive cardiac conditions. As a result, Mauldin was forced to take approved FMLA leave beginning December 1, 2025 due to the ongoing medical impact of the agency's actions.

56. As of the date of filing this complaint, the agency has not made a final decision on any of Mauldin's requests for RAs.

57. Since Bass's original interim approval of Mauldin's July 3, 2025 request for 100% telework, she has not once required Mauldin to report into the office in person, which further demonstrates that Mauldin can perform all the essential functions of his position while teleworking from his home office.

**Tarik Smajic**

58. Smajic suffers from multiple permanent spinal disabilities, including degenerative disc disease of the cervical and lumbar spine, multi-level herniated discs, and spinal stenosis with foraminal narrowing, as a result of significant injuries he suffered in an April 2017 automobile accident when a drunk driver traveling at a high rate of speed rammed into his vehicle. Multiple MRI studies show progression of disc degeneration, worsening nerve compression, and increased loss of spinal alignment over time.

59. These conditions interact to produce chronic pain, neuropathy, muscle weakness, and restricted mobility. In the cervical spine, nerve impingement causes persistent neck pain, headaches, and radiating pain into the shoulders and arms, limiting posture, range of motion, and

fine motor function. In the lumbar spine, disc degeneration and herniations result in constant low back pain, sciatica, radiculopathy, and difficulty walking, sitting, or standing for prolonged periods. Imaging demonstrates that his condition has worsened over time rather than stabilized.

60.     Smajic's spinal conditions substantially limit multiple major life activities, including walking, standing, sitting, bending, lifting, sleeping, concentrating, and working. The combination of chronic pain, nerve compression, and medication side effects limits both Smajic's physical endurance and his cognitive functioning during flare-ups.

61.     Smajic began working for CRM in July 2023 as a Supervisory IT Program Manager, GS-2210-14.

62.     Despite his disabilities, Smajic did not initially request telework as a reasonable accommodation because the agency allowed him to telework three days per week pursuant to its standard telework policy.

63.     The essential functions of Smajic's Supervisory IT Program Manager position include: managing enterprise-wide custom development projects, software implementations, and system upgrades and patching; serving as Contracting Officer's Representative on all software services related contracts; creating and managing a project dashboard; overseeing the initial planning stages for projects; tracking deadlines, deliverables, and resources; providing management and oversight to all cyber security efforts; managing the maintenance and patching of the software services platforms; and directly supervising federal and/or contract members of his unit.

64.     The essential functions of Smajic's position did not require his in-person presence. The job duties that Smajic performed on the days he reported to the office in-person did not need to be performed in-person, and he performed them equally effectively while

teleworking from his home office. Indeed, Smajic can perform all essential functions of his Supervisory IT Program Manager position while teleworking.

65.    For the July 1, 2023 to June 30, 2024 appraisal period, Smajic received an "Exceeds Expectations" rating while teleworking three days per week.

66.    Smajic's exceptional job performance demonstrates both that he could perform the essential functions of his position with accommodations, and that if needed, telework would be a reasonable and effective accommodation for those disabilities.

67.    In late-January 2025, the Trump administration issued a return-to-office mandate that purported to require federal agencies to require their employees to report to the office in person five days per week. The agency ordered all employees to begin reporting to the office five days per week, effective February 24, 2025.

68.    On February 18, 2025, Smajic requested RAs that would allow him to continue his existing telework arrangement whereby he could telework from his home office three days per week so that he could use the inversion table and other equipment he purchased for his home office to relieve pressure on his cervical and lumbar spine.

69.    Under CRM policy, a final decision on Smajic's request for RAs should have been made within thirty business days, or by April 1, 2025.

70.    At the time Smajic made this February 18, 2025 request for RAs, his supervisors knew about his disabilities. Specifically, Stacie Bass (third-line supervisor) and Janusz Wasiolek (second-line supervisor) both had knowledge of Smajic's disabilities and his requests for RAs, as did Reasonable Accommodation Coordinators Rebecca Merritt and Zainub Cementwala. The position held by Smajic's first-line supervisor was vacant, so Wasiolek also served as Smajic's acting first-line supervisor.

14

71.    During a March 31, 2025 meeting for which Bass did not offer Smajic an option to attend virtually, the purported purpose of which was to discuss Smajic's February 18, 2025 request for RAs, Bass minimized and mocked the severity of his disability by referring to his request for telework as a reasonable accommodation as a "like" or a "want" rather than the medically supported need he had established. When Smajic explained that the refusal to grant his RAs had resulted in increased pain and forced him to increase his pain medication dosage, Bass responded with words to the effect of, "It's your body, you can choose not to take the pills."

72.    During the March 31, 2025 meeting, Bass refused to grant Smajic's February 18, 2025 request for RAs, and instead "offered" to move Smajic from his longstanding three-day-per-week telework schedule to a schedule in which Smajic would be required to report to the office in person five days per week, but for only half of each day. Presumably Smajic would then be expected to return home each day and telework from his home office for the second half of the day.

73.    Bass couched this threat of a five-day-in-office schedule as an interim alternative RA, but the schedule would do nothing to accommodate Smajic's disabilities, and appeared specifically targeted to exacerbate his disabilities and worsen his health by eliminating his access to the equipment he used in his home office to relieve pressure on his cervical and lumbar spine, and by subjecting him to the physical stresses on his back caused by a daily commute.

74.    Bass also "offered" the option of teleworking only two non-consecutive days per week as another interim alternative accommodation, but offered no explanation for why she reduced the number of telework days from three to two, nor for the requirement that the telework days be non-consecutive—a particularly harmful requirement given the unpredictability of Smajic's symptoms and pain levels on any given day.

75.    During the March 31, 2025 meeting, Bass told Smajic that his position would be subject to a so-called "telework eligibility" review, which Smajic also understood as a threat to revoke his ability to telework as a reasonable accommodation altogether. Smajic had successfully performed the essential functions of his position while teleworking three days per week since July 2023, so there was no question that his job could be performed effectively while teleworking.

76.    Bass's dismissive, confrontational, and hostile tone during the March 31, 2025 meeting left Smajic fearful that Bass would deny his February 18, 2025 request for RAs and any other telework RA arrangement that would enable him to continue performing the essential functions of his position.

77.    Smajic's uncertainty about his job security was compounded by the agency's refusal to make a final decision on his request for his RAs and Bass's implied threat that the "telework eligibility" review could result in the revocation of his existing telework schedule.

78.    Over the ensuing months, Bass and Merritt would cite the purported ongoing "telework eligibility" review as the reason for the agency's delay in issuing a final determination on Smajic's February 18, 2025 request for RAs, but on information and belief, that explanation for the delay was knowingly false and pretextual.

79.    At the same time, on information and belief, the agency did not subject non-disabled CRM managers who teleworked to the same type of purported "telework eligibility" reviews.

80.    On April 14, 2025, Smajic asked for a long-overdue final determination on his February 18, 2025 request for RAs, but Bass refused to grant one.

81.    On or about May 2, 2025, Bass took over responsibility for reviewing Smajic's

timesheets from his designated timekeeper, and subjected his work hours and his use of sick leave to increased scrutiny. On information and belief, Bass did not similarly micromanage the timesheets of her reports who had not requested RAs or filed EEO complaints.

82.     At some point between February 18, 2025 and May 15, 2025, Bass accessed Smajic's personal medical records related to his disability, without his authorization and without any need to access those records. Under DOJ policy, Smajic's first-line supervisor—not Bass—processes his requests for RAs and acts as the deciding official for those RA requests, but Bass placed herself in that deciding official role contrary to agency policy.

83.     On July 23, 2025, Smajic submitted a revised request for RAs supported by new documentation from his treating physician noting that Smajic's latest MRI scans revealed a measurable deterioration of his condition, including spinal cord flattening that was not previously present, increased severity of foraminal stenosis, and encroachment on nerve roots, resulting in more persistent and debilitating symptoms.

84.     Smajic requested approval to telework full time every day of the week, with in-office presence only when required by mission needs and with at least 48 hours written notice from his supervisor ("100% telework").

85.     On August 19, 2025, Bass formally denied Smajic's requests for RAs that he originally submitted on February 18, 2025, and which he amended on July 23, 2025.

86.     On August 27, 2025, Wasiolek issued to Smajic a document titled "Tarik ITM Status Update and Assignment Plan," which purported to assign him numerous additional job duties and performance expectations that far exceed the terms of his Performance Work Plan. The document served as an informal performance improvement plan and required that Smajic perform weekly check-ins to report on his progress—a requirement that Wasiolek has not

17

imposed on any of his non-disabled reports—all done in a retaliatory effort to establish a false record of poor performance to serve as a pretext for Smajic's eventual removal from federal service.

87.    Also on August 27, 2025, Wasiolek issued Smajic's annual performance review for which he was the Rating Official and Bass was the Reviewing Official, in which Wasiolek lowered his rating in five of ten categories from his 2024 ratings of "Exceeds Expectations" (which Wasiolek approved in 2024 as Reviewing Official) to "Meets Expectations," in a retaliatory effort to establish a false record of declining performance to serve as a pretext for Smajic's eventual removal from federal service.

88.    Beginning on August 26, 2025 and continuing through December 6, 2025, Bass required Smajic to report to the office in person three days per week, despite the fact that the agency provided no in-office equipment similar to the equipment Smajic uses while working remotely as a reasonable accommodation for his disabilities.

89.    On September 3, 2025, Bass denied Smajic's request for reconsideration of her August 19, 2025 denial of his request for 100% telework.

90.    On September 5, 2025, following the denial of his request for 100% telework as an RA and the denial of his request for reconsideration, Smajic requested as an alternative RA that the agency provide him with the same or substantially similar in-office equipment to that he used in his home office, so that he could relieve pressure on his cervical and lumbar spine when he reported to the office in person.

91.    Smajic requested equipment such as an inversion table for spinal decompression and pressure relief, a laptop stand designed to enable laptop use while working in a reclined posture, a mattress with adjustable base for therapeutic spinal unloading in adjustable positions,

18

and a back support cushion for proper spinal alignment and decompression while seated or reclined.

92.    Smajic reported to the office in person, usually in extreme pain, on September 8, 9, 10, 16, 18, 23, and 29, 2025, and had to leave early on several of those days because of the unbearable pain. Because of agonizing flareups, Smajic also took some ad hoc leave on days he had originally planned to come into the office.

93.    On September 22, 2025, Bass issued Smajic a letter of counseling and revoked his approval to telework from his primary residence in Jacksonville, Florida.

94.    Meanwhile, on information and belief, the agency took no action on Smajic's RA request for in-office equipment between September 5, 2025 and November 20, 2025, at which point Bass sent Smajic medical questionnaires to be completed by Smajic's physician which addressed not the list of equipment Smajic had submitted almost two months earlier, but rather the ZeroGravity chair that the agency repeatedly insisted Smajic use instead, even though Smajic previously explained as early as April 14, 2025 that the ZeroGravity chair is not an effective alternative accommodation.

95.    On December 3, 2025, Wasiolek directed Smajic to report to the office in person the following two days, and report to the office in person three days per week going forward.

96.     Also on December 3, 2025, Smajic asked Bass, Wasiolek, and Merritt via email to confirm in writing that the agency required him to report to the office in-person three days per week, knowing that there was no equipment in the office to accommodate his disabilities, and despite Smajic having provided on September 5, 2025 a list of equipment that he uses in his home office to effectively accommodate his disabilities, which the agency could have easily obtained for his agency office.

19

97.    On December 9, 2025, Bass notified Smajic via email that the agency would not offer any in-office accommodations that would enable him to perform the essential functions of his position, and instead intended to pursue involuntary reassignment as an "accommodation of last resort." Bass noted that Smajic would be removed from federal service if there was no "suitable position" to which to reassign him.

98.    On information and belief, the agency never took any action to acquire any of the equipment that Smajic used in his home office to effectively accommodate his disabilities and perform the essential functions of his position, and that Smajic identified to the agency in detail in his September 5, 2025 email.

**The Agency Systematically Discriminates Against Disabled Employees
Who Need Telework as a Reasonable Accommodation.**

99.    Since January 2025 and continuing through the present, the agency has systematically discriminated against employees with disabilities by categorically refusing to make final decisions granting requests for telework as a reasonable accommodation, in violation of the Rehabilitation Act and of the agency's established policies and procedures regarding reasonable accommodations.

100.    On January 22, 2025, Charles Ezell, the Acting Director of the U.S. Office of Personnel Management issued a memorandum to the heads of all federal agencies including DOJ titled, "Guidance on Presidential Memorandum Return to In-Person Work" ("OPM Memo"), which purported to direct all agencies to "revise their agency's telework policy…to state that eligible employees must work full time at their respective duty stations unless excused due to a disability, qualifying medical condition, or other compelling reason certified by the agency head and the employee's supervisor."

101.    On February 20, 2025, and in response to the OPM Memo, the agency issued an

updated version of DOJ Policy Statement on Telework, 1200.01 ("Telework Policy") which read in part, "[a]n employee may only be approved for regularly scheduled telework on the basis of: (1) an approved reasonable accommodation request based on disability…or qualifying medical condition, or (2) another compelling reason certified by the Deputy Attorney General through the Assistant Attorney General for Administration and the employee's supervisor."

102.    The Telework Policy stated further in part that "[r]equests for telework as a reasonable accommodation of a disability, PWFA, or other qualifying medical condition are handled in accordance with DOJ Policy Statement 1100.01, Reasonable Accommodation, and DOJ Instruction, 1100.01.01, Reasonable Accommodation Process, and federal regulations implementing the PWFA at 29 C.F.R. part 1636."

103.    In turn, DOJ Instruction, 1100.01.01, Reasonable Accommodation Process ("RA Process") states in part that a "final decision and provision of the accommodation should be made within 30 business days of the request, barring extenuating circumstances…If an accommodation can be provided in less time than the maximum time authorized in these procedures, failure to do so may result in a violation of the Rehabilitation Act."

104.    On information and belief, Bass refused to make final determinations granting requests for telework as a reasonable accommodation—including the requests of Mauldin and Smajic—at the direction of her superiors, and as part of a systematic, agency-wide practice of refusing to grant requests for telework as a reasonable accommodation, in violation of the Rehabilitation Act.

105.    From February 2025 through May 2025, Bass repeatedly violated established agency policies with respect to Mauldin's and Smajic's requests for reasonable accommodations.

106.    At some point between February 6, 2025 and April 1, 2025, Bass accessed

21

Mauldin's personal medical records related to his disability, without his authorization and without any need to access those records.

107. At some point between February 18, 2025 and May 15, 2025, Bass accessed Smajic's personal medical records related to his disability, also without his authorization and without any need to access those records.

108. Under then-current agency policy, Mauldin's and Smajic's first-line supervisor—not Bass—is responsible for processing requests for RAs and acting as the deciding official for those RA requests, but Bass placed herself in that deciding official role contrary to agency policy.

109. Bass improperly excluded Mauldin's first-line supervisor entirely from the RA interactive process, also in violation of DOJ policy.

110. Bass also repeatedly flouted the requirement to make a final decision and provision of the accommodation within thirty business days of Mauldin's and Smajic's request, and no extenuating circumstances can legitimately explain the delays.

111. Rather than follow agency policy regarding reasonable accommodations, Bass changed the policy, so that she could continue to refuse to grant requests for telework as a reasonable accommodation.

112. On May 27, 2025, Ms. Bass issued under her signature a revised version of the Criminal Division Policy and Procedures on Reasonable Accommodation, CRM1100.1.

113. The new version of CRM1100.1 made two significant changes to the CRM RA policy.

114. First, Bass became the Deciding Official for ADM employees' RA requests. Under the new version of CRM1100.1, the Deciding Official is the employee's Section Chief,

rather than the employee's first-line supervisor, as was the case under the previous version of the policy. Bass is the Section Chief for ADM. In other words, Bass changed CRM policy so that she could serve as the Deciding Official on all ADM employees' requests for telework as an RA, including Mauldin's and Smajic's requests.

115.    Second, Bass eliminated the 30-day deadline to make a final decision on requests for RAs. Although the EEOC and federal law still require a timely decision on requests for RAs, Ms. Bass changed CRM policy in such a way that the previous 30-day deadline is eliminated. Now Bass can simply repeatedly ask for unnecessary additional information about requested RAs, as she has done in Smajic's case, or repeatedly offer "interim" accommodations as she has done with Mauldin's requests, and the 30-day deadline is extended indefinitely. ("A final or interim decision and provision of the accommodation should be made within thirty (30) business days of the employee or applicant providing requested information (including medical information), barring extenuating circumstances.")

116.    On information and belief, Bass made these changes to CRM1100.1 at the direction of her superiors, and as part of a systematic, agency-wide practice of refusing to grant requests for telework as a reasonable accommodation, in violation of the Rehabilitation Act.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

Joshua Mauldin

117.    Mauldin timely contacted an EEO counselor on April 24, 2025 to file an informal complaint about the agency's continuing failure to make a final decision on his February 6, 2025 request for RAs.

118.    The agency issued Mauldin a May 27, 2025 Notice of Right to File a Formal Complaint, and Mauldin timely filed within fifteen days his formal EEO complaint of disability

discrimination and retaliation on June 4, 2025, and named Bass, Merritt, and Wasiolek as the agency officials responsible for the agency's discriminatory and retaliatory actions. On information and belief, Bass, Merritt, and Wasiolek were interviewed by the EEO investigator in connection with Mauldin's complaint at some point between September and November 2025.

119.    On October 3, 2025, Mauldin timely amended his formal EEO complaint to add claims for the agency's continuing failure to take action on his May 27, 2025 request for a desk audit and reclassification review, resulting in a denial of a timely promotion to GS-15 and associated back pay and benefits, and for the agency's continuing failure to make a final decision on any of his requests for RAs.

120.    On December 10, 2025, Mauldin again timely amended his formal EEO complaint to add claims based on actions he first learned of when he received the Desk Audit Memo on November 24, 2025: (1) his supervisors provided intentionally inaccurate and misleading information about his job duties in connection with the desk audit of Mauldin's position; (2) his supervisors removed his supervisory duties effective November 30, 2025; and (3) his supervisors demoted him from grade from 14 to 13 effective November 30, 2025, which will result in a salary cut. Mauldin's amended complaint also added claims related to the removal of several of Mauldin's other significant job duties, as memorialized in a new position description issued to Mauldin on November 30, 2025.

121.    Mauldin's claims have all been administratively exhausted, and this Complaint is ripe for filing because more than 180 days have passed since he filed his original June 4, 2025 formal EEO complaint.

<u>Tarik Smajic</u>

122.    Smajic timely contacted an EEO counselor on April 16, 2025 to file an informal

complaint about the agency's continuing failure to make a final decision on his February 18, 2025 request for RAs.

123.    The agency issued Smajic a May 16, 2025 Notice of Right to File a Formal Complaint, and Smajic timely filed within fifteen days his formal EEO complaint of disability discrimination and retaliation on May 30, 2025, and named Bass, Merritt, and Wasiolek as the agency officials responsible for the agency's discriminatory and retaliatory actions. The EEO investigator interviewed Wasiolek and Merritt in connection with Smajic's complaint in September 2025, and interviewed Bass in November 2025.

124.    On October 2, 2025, Smajic timely amended his formal EEO complaint to add claims for: (1) the agency's August 19, 2025 final decision denying his July 23, 2025 request for RAs; (2) Bass requiring Smajic to report to the office in person from August 26, 2025 through the date of the amended complaint, despite the agency providing no in-office equipment similar to the equipment Smajic uses while working remotely as a reasonable accommodation for his disabilities; (3) Wasiolek's August 27, 2025 issuance of the "Tarik ITM Status Update and Assignment Plan," which purported to assign Smajic numerous additional job duties and performance expectations; (4) Wasiolek's August 27, 2025 issuance of Smajic's annual performance review in which Wasiolek lowered Smajic's ratings in 5 of 10 categories; (5) Bass's September 3, 2025 denial of Smajic's request for reconsideration of her August 19, 2025 denial of Smajic's request for RAs; and (6) Bass's September 22, 2025 revocation of Smajic's approval to telework from his residence in Florida and her issuance of a letter of counseling to Smajic.

125.    Smajic's claims have all been administratively exhausted, and this Complaint is ripe for filing because more than 180 days have passed since he filed his original May 30, 2025 formal EEO complaint.

## COUNT ONE

## DISABILITY DISCRIMINATION (FAILURE TO ACCOMMODATE) IN VIOLATION OF THE REHABILITATION ACT
### (Joshua Mauldin)

126.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

127.    Mauldin has been diagnosed with PTSD and GAD, which substantially limit his ability to concentrate, think, work, and interact with others. He has also been diagnosed with Wolff-Parkinson-White (WPW) syndrome, atrial fibrillation (AFib), and tachycardia, which substantially limit the operation of his circulatory system. He is therefore an individual with a disability within the meaning of 42 U.S.C. § 12102.

128.    Mauldin is a qualified individual with a disability within the meaning of 42 U.S.C. § 12111.

129.    At all relevant times, Mauldin could fully perform the essential functions of his position with reasonable accommodations, including while teleworking.

130.    Since starting his Supervisory IT Program Manager position with CRM in February 2024 and continuing through the present, as set forth in detail previously in this complaint, Mauldin performed the essential functions of his position at a level that exceeded the agency's expectations.

131.    Telework has therefore proven to be an effective accommodation that enables Mauldin to perform the essential functions of his position.

132.    Mauldin's supervisors (Bass, Wasiolek, and Moore) had actual notice of Mauldin's disabilities and his requests for RAs, and knew that his disabilities limited him in a way that required RAs.

133.    Mauldin gave the agency all the information it requested about his disabilities and his requested RAs, including letters from his medical provider.

134.    The agency discriminated against Mauldin on the basis of his disability when it refused to make a final decision granting the following requests he made for reasonable accommodations:

i.      His February 6, 2025 request to telework at least nine days out of every ten workdays per pay period, and to report in person only if his condition allowed and if his in-person presence was necessary, with advance written notice of any requirement to report to the office in person more frequently than one day per pay period;

ii.     His request to attend virtually the April 1, 2025 meeting to discuss his request for telework as a reasonable accommodation; and

iii.    His July 3, 2025 request to telework full time every day of the week, with in-office presence only when required by mission needs and with at least twenty-four hours' written notice from his supervisor ("100% telework").

135.    The agency participated in the interactive process in bad faith, offering false and shifting excuses for the needless delays in reaching a final decision on Mauldin's requests for reasonable accommodations for disabilities that are indisputably permanent, and for which Mauldin has provided the agency with all the supporting medical documentation it has requested.

136.    The agency's failure to accommodate Mauldin is a continuing violation.

## <u>COUNT TWO</u>

**DISABILITY DISCRIMINATION (FAILURE TO ACCOMMODATE)
IN VIOLATION OF THE REHABILITATION ACT
(Tarik Smajic)**

137.    The allegations of the foregoing paragraphs are incorporated as if realleged

herein.

138.    Smajic suffers from multiple permanent spinal disabilities, including degenerative disc disease of the cervical and lumbar spine, multi-level herniated discs, and spinal stenosis with foraminal narrowing, which substantially limit multiple major life activities, including walking, standing, sitting, bending, lifting, sleeping, concentrating, and working. He is therefore an individual with a disability within the meaning of 42 U.S.C. § 12102.

139.    Smajic is a qualified individual with a disability within the meaning of 42 U.S.C. § 12111.

140.    At all relevant times, Smajic could successfully perform the essential functions of his position with reasonable accommodations, including while teleworking.

141.    Since starting his Supervisory IT Program Manager position with CRM in July 2023 and continuing throughout his tenure with the agency the present, as set forth in detail previously in this complaint, Smajic performed the essential functions of his position at a level that met or exceeded the agency's expectations.

142.    Telework has therefore proven to be an effective accommodation that enables Smajic to perform the essential functions of his position.

143.    Smajic's supervisors (Bass and Wasiolek) had actual notice of Smajic's disabilities and his requests for RAs, and knew that his disabilities limited him in a way that required RAs.

144.    Smajic gave the agency all the information it requested about his disabilities and his requested RAs, including letters from his medical provider.

145.    The agency discriminated against Smajic on the basis of his disability when it refused to grant the following requests he made for reasonable accommodations:

28

      i.     His February 18, 2025 request to continue as a reasonable accommodation for his disabilities his existing three-day-per-week telework schedule; and

      ii.     His July 23, 2025 request to telework full time every day of the week, with in-office presence only when required by mission needs and with at least forty-eight hours' written notice from his supervisor ("100% telework"); and

      iii.     His September 5, 2025 request for in-office accommodations and commuting accommodations that would enable him to perform the essential functions of his position on the days the agency required him to report to the office in person.

146.     The agency participated in the interactive process in bad faith, offering false and pretextual justifications for the needless delays in reaching a final decision on, and ultimately denying, Smajic's requests for reasonable accommodations for disabilities that are indisputably permanent, and for which Smajic provided the agency with all the supporting medical documentation it requested.

147.     The agency's failure to accommodate Smajic is a continuing violation.

## COUNT THREE

**DISABILITY DISCRIMINATION (DISPARATE TREATMENT)
IN VIOLATION OF THE REHABILITATION ACT
(Joshua Mauldin)**

148.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

149.     As set forth above, Mauldin is an individual with a disability within the meaning of 42 U.S.C. § 12102.

150.     Mauldin is a qualified individual because at all relevant times, he could fully perform the essential functions of his position with reasonable accommodations, including while

teleworking.

151.     Mauldin suffered adverse employment actions when: (1) the agency without legitimate justification continues to delay a final decision on his request for 100% telework as a reasonable accommodation; (2) his supervisors provided intentionally inaccurate and misleading information about his job duties in connection with the desk audit of his position; (3) his supervisors removed his supervisory duties and other significant job duties effective November 30, 2025; and (3) his supervisors demoted him from grade from 14 to 13 effective November 30, 2025, which will result in a salary cut.

152.     The agency's adverse actions against Mauldin give rise to an inference of discrimination on the basis of his disabilities.

153.     The agency claimed that CRM supervisors like Mauldin must report to the office one day per week so that they can supervise their reports in person, but the agency allowed a non-disabled CRM Supervisory Budget Analyst and a non-disabled CRM Supervisory Financial Manager under Bass's supervision to telework full-time in 2024 and 2025, without requiring them to supervise their reports in person.

154.     Likewise, Bass and other non-disabled CRM supervisors do not supervise their reports in person. For example, Monet Gregory, Senior Advisor to the Executive Officer (Bass), works full time in Pennsylvania, while Bass works full time in Washington, D.C., and the agency does not require Bass to supervise Gregory in person.

155.     The agency failed to follow its own policies and procedures with respect to Mauldin's requests for reasonable accommodations and his request for a desk audit.

156.     The agency did not similarly remove the supervisory duties nor demote other CRM supervisors who did not have disabilities.

157.    The agency did not similarly remove the supervisory duties nor demote other CRM supervisors who did not request telework as a reasonable accommodation for their disabilities.

158.    Mauldin's performance evaluations demonstrate that his job performance exceeded the agency's expectations, so his demotion and the removal of his supervisory and other job duties cannot be explained by poor performance.

## COUNT FOUR

### DISABILITY DISCRIMINATION (DISPARATE TREATMENT) IN VIOLATION OF THE REHABILITATION ACT
### (Tarik Smajic)

159.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

160.    As set forth above, Smajic is an individual with a disability within the meaning of 42 U.S.C. § 12102.

161.    Smajic is a qualified individual because at all relevant times, he could fully perform the essential functions of his position with reasonable accommodations, including while teleworking.

162.    Smajic suffered adverse employment actions when: (1) the agency without legitimate justification delayed a final decision on his requests for telework as a reasonable accommodation; (2) Bass issued an August 19, 2025 final decision denying his July 23, 2025 request for 100% telework as a reasonable accommodation; (3) Bass required Smajic to report to the office in person from August 26, 2025 through December 6, 2025, despite the agency providing no in-office equipment similar to the equipment Smajic uses while working remotely as a reasonable accommodation for his disabilities; (4) Wasiolek issued an August 27, 2025

memorandum entitled, "Tarik ITM Status Update and Assignment Plan"; (5) Wasiolek issued on August 27, 2025 Smajic's annual performance review in which Wasiolek lowered Smajic's ratings in five of ten categories; (6) Bass denied on September 3, 2025 Smajic's request for reconsideration of her August 19, 2025 denial of Smajic's request for RAs; and (7) Bass revoked on September 22, 2025 Smajic's approval to telework from his residence in Florida and issued a letter of counseling to Smajic.

163. The agency's adverse actions against Smajic give rise to an inference of discrimination on the basis of his disabilities.

164. The agency claimed that CRM supervisors like Smajic must report to the office at least one day per week so that they can supervise their reports in person, but the agency allowed a non-disabled CRM Supervisory Budget Analyst and a non-disabled CRM Supervisory Financial Manager under Bass's supervision to telework full-time in 2024 and 2025, without requiring them to supervise their reports in person.

165. Likewise, Bass and other non-disabled CRM supervisors do not supervise their reports in person. For example, Monet Gregory, Senior Advisor to the Executive Officer (Bass), works full time in Pennsylvania, while Bass works full time in Washington, D.C., and the agency does not require Bass to supervise Gregory in person.

166. The agency failed to follow its own policies and procedures with respect to Smajic's requests for reasonable accommodations.

167. The agency forced Smajic to report to the office in person, despite having taken no action to obtain the in-office equipment Smajic identified as effective in accommodating his disabilities when he worked out of his home office.

168. Instead, the agency again offered Smajic in November 2025 a ZeroGravity chair

after Smajic had already explained in detail in April 2025 the many ways in which the proposed chair would not effectively accommodate his disabilities.

## COUNT FIVE

**RETALIATION IN VIOLATION OF THE REHABILITATION ACT**
**(Joshua Mauldin)**

169.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

170.    Mauldin engaged in activity protected by the anti-retaliation provisions of the Rehabilitation Act on numerous occasions, including but not limited to: (1) requesting reasonable accommodations as set forth in the foregoing paragraphs of this complaint; (2) contacting an EEO counselor on April 24, 2025 about the agency's failure to accommodate; (3) submitting on June 4, 2025 his formal EEO complaint; (4) submitting on October 3, 2025 and December 10, 2025 amendments to his EEO formal complaint regarding the agency's ongoing failure to make a final determination on his requests for RAs; and (5) participating in the EEO investigation process.

171.    The agency subjected Mauldin to materially adverse actions because of his protected activity, including but not limited to: (1) the agency without legitimate justification continues to delay a final decision on his request for 100% telework as a reasonable accommodation; (2) his supervisors provided intentionally inaccurate and misleading information about his job duties in connection with the desk audit of his position; (3) his supervisors removed his supervisory duties and other significant job duties effective November 30, 2025; and (3) his supervisors demoted him from grade from 14 to 13 effective November 30, 2025, which will result in a salary cut.

## COUNT SIX

### RETALIATION IN VIOLATION OF THE REHABILITATION ACT
### (Tarik Smajic)

172.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

173.    Smajic engaged in activity protected by the anti-retaliation provisions of the Rehabilitation Act on numerous occasions, including but not limited to: (1) requesting reasonable accommodations as set forth in the foregoing paragraphs of this complaint; (2) contacting an EEO counselor on April 16, 2025 about the agency's failure to accommodate; (3) submitting on May 30, 2025 his formal EEO complaint; (4) submitting on October 2, 2025 an amendments to his EEO formal complaint regarding the agency's denial of his requests for RAs; and (5) participating in the EEO investigation process.

174.    The agency subjected Smajic to materially adverse actions because of his protected activity, including but not limited to: (1) denying on August 19, 2025 his July 23, 2025 request for RAs; (2) requiring Smajic to report to the office in person from August 26, 2025 through December 6, 2025, despite the agency providing no in-office equipment similar to the equipment Smajic uses while working remotely as a reasonable accommodation for his disabilities; (3) Wasiolek's August 27, 2025 issuance of the "Tarik ITM Status Update and Assignment Plan," which purported to assign Smajic numerous additional job duties and performance expectations; (4) Wasiolek's August 27, 2025 issuance of Smajic's annual performance review in which Wasiolek lowered Smajic's ratings in 5 of 10 categories; (5) Bass's September 3, 2025 denial of Smajic's request for reconsideration of her August 19, 2025 denial of Smajic's request for RAs; and (6) Bass's September 22, 2025 revocation of Smajic's approval to telework from his residence in Florida and her issuance of a letter of counseling.

34

**PRAYER FOR RELIEF**

As a direct and proximate result of the agency's actions, Mauldin suffered and continues to suffer significant emotional, psychological, and physical harm, including exacerbation of his PTSD and Generalized Anxiety Disorder symptoms; increased anxiety, panic symptoms, sleep disruption, emotional distress, humiliation, and loss of stability; increased stress-sensitive cardiac symptoms, including increased arrhythmia episodes, elevated heart rate, elevated blood pressure, and related emergency medical concerns; escalation of psychiatric medication; transition to blood thinner therapy; the need for cardiac ablation surgery; delayed recovery; and the need for unpaid FMLA leave because of the worsening of his psychiatric and cardiac conditions. Mauldin also sustained pecuniary losses, past and future loss of income and benefits of employment, lost career opportunities and advancement, and other past and future pecuniary losses.

As a direct and proximate result of the agency's actions, Smajic suffered and continues to suffer significant emotional, psychological, and physical harm, including worsening chronic spinal pain, increased cervical and lumbar flare-ups, reduced mobility and endurance, sleep disruption, increased need for medical treatment, including multiple cervical and lumbar epidural steroid injections, medication management, and leave, and exacerbation of anxiety and depression requiring behavioral health treatment and monitoring. The sustained stress caused by the agency's actions also required additional cardiac evaluation and monitoring for recurrent chest pain and abnormal stress-test findings. These harms impaired Smajic's ability to work, manage his health, and participate fully in family life, including events and responsibilities involving his children. Smajic also sustained pecuniary losses, past and future loss of income and benefits of employment, lost career opportunities and advancement, and

other past and future pecuniary losses.

WHEREFORE, Plaintiffs, by counsel, request that this Court enter judgment in their favor against Defendant on the above Counts as follows:

a) Award Plaintiffs compensatory damages (economic and non-economic) to be determined by a jury, including pre-trial and post-trial interest, plus demonstrated past and future pecuniary damages, on the above-stated Counts; and

b) Award Plaintiffs injunctive and equitable relief, including, but not limited to:

- Cancelation of Mauldin's demotion to Grade 13, restoration of Mauldin to Grade 14, and reinstatement of his original job duties including supervisory duties;

- Expungement of any reference to a demotion or grade reduction from Mauldin's Official Personnel File;

- Issuance of final decision granting Mauldin's request for 100% telework as a reasonable accommodation as defined above;

- Reversal of final decision denying Smajic's request for 100% telework as a reasonable accommodation as defined above, and issuance of final decision granting that request;

- Raise Smajic's rating for the July 2024 to June 2025 appraisal periods from "Meets Expectations" to "Exceeds Expectations";

- Order the agency to provide training for agency personnel found to have engaged in discrimination, and to consider taking disciplinary action against those officials who engaged in the discrimination; and

- Order the agency to cease and desist its systematic practice of refusing to

issue final decisions granting telework as a reasonable accommodation for employees with disabilities;

- Order the agency to take all necessary steps to ensure that Plaintiffs have no contact with the supervisors responsible for the discrimination and/or retaliation, as well as to provide Plaintiffs with a designated management official to whom they can report any subsequent acts of discrimination and/or harassment; and

c) Award Plaintiffs' attorneys' fees and costs for all Counts that allow for the recovery of attorneys' fees and costs; and

d) Award Plaintiffs' interest, costs including expert costs, and such other and further relief as may be appropriate under the circumstances.

### **JURY DEMAND**

Plaintiffs demand a trial by jury on all counts so triable.


May 26, 2026                                    Respectfully submitted,

                                               DISTRICT EMPLOYMENT LAW, PLLC

                                               By:  _/s/_____

                                               Peter Whelan (D.C. Bar No. 992346)
                                               1101 Connecticut Ave. NW, Suite 450
                                               Washington, DC 20036
                                               (202) 810-6150
                                               whelan@districtemploymentlaw.com

                                               *Counsel for Plaintiffs Joshua Mauldin*
                                               *and Tarik Smajic*


37